IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

KAREN TURLEY,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )      Case No.
                                       )      11-5110-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner of     )
Social Security,                       )
                                       )
                    Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Karen Turley seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding that plaintiff's impairments are not severe and in rejecting plaintiff's testimony. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On May 6, 2010, plaintiff applied for disability benefits alleging that she had been disabled since March 1, 2010. Plaintiff's disability stems from osteoarthritis, depression, anxiety, and panic attacks. Plaintiff's application was denied on July 28, 2010. On January 25, 2011 a hearing was held before an Administrative Law Judge. On February 11, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 28, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than

2

twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

            Yes = not disabled.
            No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

            No = not disabled.
            Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

            Yes = disabled.
            No = not disabled.

IV.    *THE RECORD*

The record consists of the testimony of plaintiff and documentary evidence admitted at the hearing.

3

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1973 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1973 | $ 110.93 | 1992 | $ 2,649.79 |
| 1974 | 104.36 | 1993 | 2,894.00 |
| 1975 | 0.00 | 1994 | 4,913.78 |
| 1976 | 40.46 | 1995 | 4,984.41 |
| 1977 | 329.00 | 1996 | 3,024.80 |
| 1978 | 0.00 | 1997 | 6,432.46 |
| 1979 | 0.00 | 1998 | 484.18 |
| 1980 | 0.00 | 1999 | 484.13 |
| 1981 | 175.03 | 2000 | 4,548.65 |
| 1982 | 0.00 | 2001 | 7,273.55 |
| 1983 | 0.00 | 2002 | 14,178.73 |
| 1984 | 993.55 | 2003 | 4,630.98 |
| 1985 | 1,313.72 | 2004 | 10,687.55 |
| 1986 | 697.95 | 2005 | 6,144.95 |
| 1987 | 1,498.06 | 2006 | 8,899.44 |
| 1988 | 3,361.56 | 2007 | 11,849.70 |
| 1989 | 0.00 | 2008 | 8,757.36 |
| 1990 | 1,028.39 | 2009 | 14,335.18 |
| 1991 | 2,293.55 | 2010 | 0.00 |

(Tr. at 100).

## Disability Report - Field Office

On May 25, 2010, plaintiff met with D. Ackerson at Disability Determinations (Tr. at 122-124). D. Ackerson observed no difficulty in plaintiff's ability to hear, read, breathe, understand, talk, answer, sit, stand, walk, see, use her hands, write, or with her coherency (Tr.

4

at 123).  Dr. Ackerson wrote:

> Claimant came in with her son[1] to file for DIB. Claimant said she stopped working due to her condition.  Claimant was able to answer all questions with little or no problems. Claimant said her doctor told her that she needed to get in here and get on Disability before her knees got so bad that they needed to be replaced.  Claimant would make little sounds during the interview as if something, as she would move, caused her some slight pain.  Claimant also kept complaining of a cooking burn on her thumb.

> Claimant said she was told by her doctor to file for DIB because her knees were getting bad and [she] needed to be on disability prior to her knees getting bad enough they might need to be replaced. Claimant kept commenting on [how] well or poor I was typing and said [that] she could type around 43 to 45 words a minute. When asked if she could speak english ok, she responded that yes she can and she can also fully speak and write German. Claimant said she is still attempting to get on unemployment and is still looking for work. Claimant said she is not one to just sit around, she always has to be doing something. Except for her slight sounds of something causing her pain, no other signs of discomfort could be detected.

(Tr. at 123).

## Function Report

In a Function Report dated June 11, 2010, plaintiff noted that she lived in an apartment with family (Tr. at 125).  When asked what she does from the time she gets up until she goes to bed, plaintiff wrote, "Look for a job and pray for my unemployment to come through." (Tr. at 125).  She takes care of her son, she cooks, cleans, and tries to get her son the medical and psychological help he needs (Tr. at 126).  She takes care of a pet (Tr. at 126).  She is unable to bend, stoop, walk long distances, carry things or lift (Tr. at 126).  She is usually in so much pain that she cannot sleep (Tr. at 126).  She has no problems dressing, bathing, caring for her hair, shaving, feeding herself, or using the toilet (Tr. at 126).  She needs no special reminders to take care of her personal needs or to take her medication (Tr. at 127).  She prepares meals on her own ("full meals for my son and myself") and does this three times a day (Tr. at 127). She can do laundry, dishes, vacuuming, cooking, she waters her plants and takes out her trash

---

[1]Plaintiff's son, who was born in 1989, has also filed an application for disability benefits (Tr. at 93).

(Tr. at 127). These tasks take her from 30 minutes to "all day" to do (Tr. at 127). Plaintiff goes out whenever her knees do not hurt. She can drive a car, she can go out alone, she goes to stores to buy food and clothing, and she can shop twice a week for two to three hours at a time (Tr. at 128). She can pay bills, count change, and handle bank accounts (Tr. at 128). Plaintiff makes things, crochets, knits, sews, watches television, reads, plays games on her computer, and walks her dog (Tr. at 129). She does these things "as often as [she] can" and is able to do them "very well" (Tr. at 129). Plaintiff is able to spend time with others, she looks for jobs and she goes to appointments (Tr. at 129). She goes out to fill out job applications and look for jobs "as often as [she] can and as much as [her] knees will allow [her] without being in constant pain." (Tr. at 129).

Plaintiff's condition affects her ability to lift, squat, band, stand, walk, sit, kneel, talk, and climb stairs (Tr. at 130). She has no difficulty reaching, seeing, completing tasks, understanding, following instructions, getting along with others, using her hands; she has no problem with her memory or concentration (Tr. at 130). She can lift 20 to 30 pounds, and she can walk about two blocks at a time (Tr. at 130). She can pay attention indefinitely (Tr. at 130). She is able to finish what she starts "without any trouble" (Tr. at 130). She has no problems following spoken or written instructions (Tr. at 130-131).

Sometimes she can handle stress well, but "right now I am having problems with anxiety and panic attacks." (Tr. at 131). She has no problems handling changes in routine (Tr. at 131). Plaintiff has a fear of losing her sanity and she is afraid she cannot find a job that she can do that does not hurt (Tr. at 131).

Disability Report - Adult

In an undated Disability Report plaintiff reported that she stopped working on April 12, 2010, for the following reason: "I was having car trouble and was not able to get it fixed, so my employer let me go." (Tr. at 145). Her condition did not cause her to make changes in her

6

work activity (Tr. at 145).

Plaintiff reported that she worked 10 hours per day, five days per week, doing computer customer service from November 3, 2008, through October 23, 2009, earning $11.25 per hour (Tr. at 146). That is 41 weeks during 2009 at $618.75 per week ($11.25 per hour for 40 hours and time and a half for the other ten hours each week), which would result in earnings of $25,368.75 for the year; however, plaintiff's earnings records show that she earned $14,335.18 during 2009 (Tr. at 100, 146).

B. SUMMARY OF MEDICAL RECORDS

On March 18, 2009, plaintiff was seen by Abel Corral, M.D. (Tr. at 174). Plaintiff was 20 minutes late for her appointment. "Reports that she's been doing very good at her job and would like to continue taking the same medicines. There are no side effects." Plaintiff talked about her 33-year-old daughter who has five children and weighs 110 pounds. "The patient continues doing good. She's working right now at the present time at NCO and makes about 11.25 an hour. Feels very good of her accomplishments and continues relating effectively in the community."

On March 19, 2009, plaintiff went to the St. John's emergency room due to having a red and itchy eye for the past two days (Tr. at 184-186). Under past medical history plaintiff reported only anxiety. Her physical exam was normal for neck, heart, lungs, and neurological condition. She was given medication for her eye.

On May 4, 2009, plaintiff was seen at St. John's emergency room for a rash (Tr. at 179-181). She reported taking no new medications. On exam, plaintiff's neck, lungs, heart, abdomen, extremities, and neurological evaluation were all normal. Everything on this exam was normal except her skin rash. She was given Prednisone [steroid] and Benadryl for the rash and itching.

7

On September 4, 2009, plaintiff went to the emergency room and Freeman Hospital due to a headache (Tr. at 192-203). Her past medical history lists only depression. She weighed 180 pounds. "Most recent headache like this was a little less than a year ago" (Tr. at 200). "Denies any significant change in her headache today versus previous exacerbations. She has no other acute complaints or concerns. There is no other history." Her physical exam was normal: her neck was normal, she had normal range of motion in her extremities with no tenderness, her joints were normal, she was alert and oriented times three with normal speech, normal mood, normal affect. She was given Benadryl and Compazine (for nausea) and said she felt better and thought she could manage it at home. The doctor wrote her a prescription for Darvon (used to relieve mild to moderate pain) and she was discharged.

On December 6, 2009, plaintiff went to the emergency room at Freeman Hospital complaining of mild back pain (Tr. at 206-216). She stated that she was trying to go to sleep and started experiencing back pain, took two Tylenol, and then thought she was having an anxiety attack. She said she had moved furniture a couple days ago and perhaps that was when the back pain started. Plaintiff denied all symptoms (including joint pain) except anxiety and depression. Her physical exam was normal (including her extremities which were non-tender with full range of motion, she was alert and oriented times three with normal mood and affect) except some back tenderness. Plaintiff's x-rays were normal. She was given Vicodin and discharged.

March 1, 2010, is plaintiff's alleged onset date.

On March 16, 2010, plaintiff was seen at Freeman Health System for right knee pain that she said had started two days earlier (Tr. at 217-229). She appeared to be in mild distress. She had normal range of motion. Her back was normal, the rest of her physical exam was normal, and her blood work was normal. X-rays of her knee showed mild degenerative joint disease. She was prescribed Mobic (non-steroidal anti-inflammatory) and was told to use an

8

over-the-counter knee sleeve.

On June 22, 2010, plaintiff was seen at Community Clinic of Joplin for right knee pain (Tr. at 251). She weighed 194.6 pounds. She had crepitus[2] and tenderness with pressure on her right knee. She reported having gone to the emergency room at Freeman in March and April[3] and had gotten diagnoses of degenerative joint disease. She was assessed with knee pain -- degenerative joint disease, and depression. She was told to use a knee brace, she was continued on Mobic (non-steroidal anti-inflammatory) and Fluoxitine (generic Prozac for depression), and she was told to follow up in four weeks.

On July 28, 2010, Geoffrey Sutton, Ph.D., completed a Psychiatric Review Technique finding no severe mental impairment and no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. at 238-248). In support of his findings, Dr. Sutton wrote:

> The claimant is a 54 y/o who alleges disability due to osteoarthritis, depression, anxiety and panic attacks with an AOD [alleged onset date] of 3/01/10. She reported medications prescribed by Dr. Corral: Ativan for anxiety and panic attacks, Lunesta for sleep and Paxil for depression.
>
> Ozark Center: Records include one follow-up with Dr. Corral dated 3/18/09 in which the claimant reported ongoing work activity and that she was doing very well with no complications from medications or SI/HI [suicidal ideation/homicidal ideation]. Per the [medical record], she was to return to care at Ozark Center with a different provider on 6/16/10 but on phone contact with Oz. Ctr. to request those records we were informed she did not keep that appointment and had not rescheduled.
>
> She had presented to Freeman ER in 12/09 for c/o [complaints of] shortness of breath after taking Tylenol for back pain with comment that she may be having a panic attack. There was a reported history of depression and anxiety but on exam, her mental status was normal. She presented again in 3/10 for an acute complaint with no signs or symptoms of mental impairment noted.

---

[2]A clicking sound heard in movement of joints.

[3]There is no evidence of an emergency room or doctor visit in April.

9

There have also been presentations to St. John's ER for acute complaints prior to AOD [alleged onset date] with no allegations or observed signs/symptoms of mental impairment.

Phone contact was made with the attorney's office who is representing the claimant for additional information regarding current treatment, but there has been no response.

3373: The claimant reported that she is currently looking for employment and is supposed to be on medications for depression, anxiety and sleep but cannot afford them. She indicates avoidance of family members, but no particular problems getting along with others or with authority. However, she did report getting out to socialize less often due to anxiety. She also reported increased anxiety over inability to find employment. Despite these complaints, she cares for her son, and a pet, performs all HH [household] chores, errands and shopping. The only limitations she noted for these activities are those due to nonmental impairments.

While the claimant has required mental health treatment with medications for depression and anxiety, there is no indication of a markedly impaired mental status in the available MER [medical records] nor does the claimant report marked limitations in daily activities due to a mental impairment.

On September 2, 2010, plaintiff was seen by Karl Stammer, R.N., at Ozark Center (Tr.

at 256-257).

HISTORY OF PRESENT ILLNESS: Patient referred herself here. There was a chart with evaluations of Dr. Corral to review. She denies any recent hospitalizations. She had been a patient of Dr. Corral up until 05/09 [i.e., 1 year and 4 months ago]. Current diagnosis is Major Depressive Disorder, recurrent, Personality Disorder, NOS [not otherwise specified]. She is under no current treatment right now, no medications. Current stressors are that her child was in foster care, this is a 21 year old child diagnosed with ADHD [attention deficit hyperactivity disorder] who has just come back to live with the patient, unemployment, no insurance and no car. Current symptoms are depression rated 9 out of 10 and insomnia. Energy and motivation are both very low. She denies any suicidal or homicidal ideation. She said that she did try to take an overdose at age 16, lost two weeks of her life, was unsuccessful. Patient describes her overall mood as "tired."

BIOPSYCHOSOCIAL: . . . No current medications. . . . Primary care physician is a local ER. She is being currently treated for knee pain and takes anti-inflammatories. . . . She said, "I am not sleeping well at all." . . . Currently she is unemployed. She has held various jobs over the years. Current living situation, she is widowed. She has been married x 1 and has five biological children. She denies any legal history [during a future appointment she would admit that she had a bad check charge on her record (Tr. at 255)], any military history [in her disability application plaintiff reported that she had been in the Army from 1975 through 1985 (Tr. at 95)], any substance abuse history, any alcohol or any tobacco use. She says she rarely partakes of caffeine. . . .

MENTAL STATUS: Karen is . . . casually dressed. She is clean with fair hygiene. . . . Her eye contact is avoidant. . . . Her speech is clear, conversational, relevant with appropriate content. Attention and concentration are intact. She is alert and oriented x 3. Her mood appears to be sad and anxious and her affect is congruent with that. Psychomotor activity shows that she is fidgety, she has good abstraction. Her judgment and insight are limited. Her memory is intact. She is a good historian. Estimated intelligence is average. Thought processes are goal directed, organized. Thought content is reality oriented. She denies perceptual disturbances, denies hallucinations, and denies any kind of delusions. She is motivated for treatment because she says "I can't stay like this forever."

IMPRESSION:
Axis I:          Mood Disorder, NOS
                 Anxiety Disorder, NOS
                 Posttraumatic Stress Disorder
Axis II:         Deferred
Axis III:        None
Axis IV:         Severe
Axis V:          GAF 35[4]

PLAN:
Paxil 20 mg 1 a day
Trazodone 50 mg 2 p.o. [by mouth] h.s. [at bedtime]
. . . She was encouraged to have caution around machinery and while ambulating. She was encouraged to have a healthy diet with exercise as tolerated. Practice good sleep hygiene. Patient will return to clinic for medication follow up in three weeks or as needed.

(Tr. at 256-257).

On September 23, 2010, plaintiff was seen by Karl Stammer, R.N., at Ozark Center (Tr. at 255). She weighed 174 pounds. She reported that her medication was working well. She was frustrated about finding a job. "Still looking for a job, in danger of losing house (renting). Has a bad check charge on her record." Her anxiety was getting worse due to lack of a job. "Expresses frustration over behavior of son who is living with her. He was gone from her life from age 10 to age 21. States she is unable to kick him out as suggested by her bishop."

---

[4]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

11

Plaintiff was dressed casually, her hygiene was good. She was alert and oriented times four. She had an anxious affect but good eye contact, logical speech and thought processes, normal psychomotor activity, and was reality oriented. She was assessed with major depressive disorder, phobic disorders,[5] and post traumatic stress disorder. Her GAF was 35. She was told to increase her Paxil, continue Trazodone, and return in three weeks.

On October 14, 2010, plaintiff was seen by Karl Stammer, R.N., at Ozark Center (Tr. at 254). She weighed 177 pounds which was up three pounds since September 23. Plaintiff reported that she was living in her car with her dog but had a lot of support from her church family. Her sleep varied, her appetite was OK. She was continuing her job search. She was alert and oriented times four, dressed casually, her hygiene was fair. She was goal directed. Plaintiff was assessed with major depressive disorder, phobic disorders, and post traumatic stress disorder. Her GAF was 35. She was continued on Paxil and Trazodone and was started on Abilify. She was told to return in two weeks.

On October 27, 2010, plaintiff was seen by Karl Stammer, R.N., at Ozark Center (Tr. at 253). She weighed 177 pounds. Plaintiff was casually dressed and had good hygiene. She reported living in her car. She was hopeful that she would find a place to live with one of her friends. She reported that her sleep was a lot better. Her appetite was down, her energy level was down, her motivational level was down. She has no suicidal ideology, no homicidal ideology. She was alert and oriented times four, she had a euthymic[6] mood and a congruent affect. She was noted as being "stable." She was assessed with major depressive disorder, phobic disorders, and post traumatic stress disorder. She was to continue her Paxil, Trazodone, and Abilify and return in four weeks.

---

[5]The assessment includes "300.2" which, in the DSM-IV, is phobic disorders.

[6]Pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated.

12

## C.    SUMMARY OF TESTIMONY

During the January 25, 2011, hearing, plaintiff testified as follows:

At the time of the hearing plaintiff was 55 years of age and is currently 56 (Tr. at 25). She went to high school through part of 11th grade and later got a GED (Tr. at 25). She received training to be a certified nurse's assistant (Tr. at 25). Plaintiff lives in a mobile home with a roommate (Tr. at 25-26). Plaintiff is 5' 5" tall and weighs 184 pounds (Tr. at 26). Since her alleged onset date, plaintiff has gained about 40 pounds[7] and no one knows why (Tr. at 26-27).

Since her alleged onset date, plaintiff has worked off and on through Express Personnel (Tr. at 26). She works at banquets earning $7.25 per hour and typically works four to five hours on each job except about once a month she works an eight-hour banquet (Tr. at 26).

Plaintiff was asked why she cannot work full time (Tr. at 27).

> I had kidney stones in November of '08. So they're my main headache, which has gotten worse since I was in a car accident in November [2010]. My knee gives out. My back gives out. My hip locks up. I can't stand up. I can't sit down for very long. And I fidget way too much.

(Tr. at 27).

Plaintiff said she has always had migraine headaches, but they have been getting worse since her accident (Tr. at 27). She usually has one migraine headache per month[8] (Tr. at 27). Plaintiff's migraines last anywhere from three days to one week (Tr. at 28). When she has a migraine she goes into a dark room and turns off everything (Tr. at 28). When asked if the

---

[7]According to the medical records, plaintiff weighed 180 pounds in September 2009, 194.6 pounds in June 2010, 174 pounds in September 2010, and 177 pounds in October 2010. This represents a range of 20 pounds. There is no evidence that plaintiff gained 40 pounds at all much less since her alleged onset date.

[8]Although plaintiff said, "I usually have one a month" (Tr. at 27), when her attorney later asked her how her migraines have gotten worse, she said, "Instead of one maybe every month, I've got maybe two or three, depending on what I'm doing. If I have to go on the computer for a long time, something in the computer triggers them." (Tr. at 28).

13

duration of her migraines is worse than it used to be, plaintiff said it was not: "Three days to a week is about the same, but they start out harder." (Tr. at 28). When she was working and had a migraine, she would go into the bathroom, take Vicodin, and it usually stopped it (Tr. at 29). Now that she is not working, plaintiff does not have Vicodin -- she uses Advil (Tr. at 29).

Plaintiff's knee bothers her whenever the weather changes or she stretches it too much by walking too far or getting up and down a lot (Tr. at 29). Plaintiff has to wear a knee brace, and a lot of people will not let her work with a knee brace on (Tr. at 29). Plaintiff's knee pain is on average a 6 1/2 out of 10, and during the hearing she described her knee as feeling like it is on fire due to the weather change (Tr. at 29). Plaintiff's knee pain is a 6 1/2 when she gets up -- the more stress she puts on it during the day, the worse it gets (Tr. at 29-30). At its worst, her knee pain is a 14 on a scale of 1 to 10 (Tr. at 30). Plaintiff takes meloxicam (an anti-inflammatory) for her pain (Tr. at 30).

Plaintiff suffers from back pain about twice a week (Tr. at 30). It lasts 8 to 12 hours depending on what she is doing (Tr. at 30).

Plaintiff has a constant dull ache in her right hip (Tr. at 30). When the weather changes, her hip does not work (Tr. at 30-31).

Plaintiff suffers from anxiety which causes her to fidget (Tr. at 31). When she feels anxious she gets up and walks around, she crochets something, she knits something, or just does something with her hands "so nothing else fidgets" (Tr. at 31). When she is out, she feels like everyone is watching her; when she is at home, she cannot concentrate on one thing and she cannot sit still (Tr. at 31).

Plaintiff suffers from depression and cannot sleep (Tr. at 32). Her doctor recently changed her depression medication because she was not sleeping and her depression was getting worse (Tr. at 32). She did not want to do anything; she just wanted to sit around like a lump (Tr. at 32). Plaintiff's medication and the support of her friends help her to want to go to

14

church (Tr. at 32).

Plaintiff has trouble remembering things that happened a couple days ago, and sometimes her mind is blank for days (Tr. at 32).

Plaintiff can stand for about 25 to 30 minutes at a time (Tr. at 33). Plaintiff can walk with her puppy about a half a block (Tr. at 33). She can sit for 30 minutes to an hour at a time (Tr. at 33). After that, her lower back gets stiff (Tr. at 33). Plaintiff can lift 20-25 pounds (Tr. at 34).

During the day plaintiff needs to lie down two to three times a day -- the day before she took two naps during the day and did not sleep at all that night (Tr. at 34).

Plaintiff has no side effects from her medication other than a bad taste in her mouth (tr. at 34).

Plaintiff spends her day crocheting, reading, walking, watching television, and playing with her dog (Tr. at 34). She sweeps, vacuums, and dusts; and if her roommate is not feeling well, plaintiff does the dishes and whatever else her roommate cannot do (Tr. at 35). She has to take rest breaks during her chores (Tr. at 35). She and her roommate go grocery shopping, but a neighbor kid helps them carry the groceries in (Tr. at 35).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Alison Brookins entered her opinion on February 11, 2011. At step one of the sequential analysis, the ALJ found that although plaintiff has worked since her alleged onset date, her work has not risen to the level of substantial gainful activity (Tr. at 12).

She found that plaintiff's headaches, low back pain, and right hip pain are not medically determinable impairments (Tr. at 13).

[T]he claimant has not even reported to treating sources near as significant of symptoms as she has alleged in connection with this application. Moreover, she has sought no ongoing treatment for headaches, low back pain, or right hip pain; her

examinations are generally normal; and no providers have diagnosed a medically determinable impairment to account for the claimant's alleged pain symptoms in her head, low back, and right hip. As such, the undersigned finds the claimant's alleged migraines, low back pain, and right hip pain are not medically determinable impairments.

(Tr. at 13).

The ALJ found that plaintiff's medically determinable impairments -- mild right knee degenerative joint disease, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder -- are not alone or in combination a severe impairment because they do not affect her ability to do basic work activities (Tr. at 12-13).

Therefore, plaintiff was found not disabled at the second step of the sequential analysis.

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining

16

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments for the reasons explained below.
>
> While the claimant has alleged significant symptoms and limitations, the clinical and objective findings in the record are inconsistent with allegations of total debilitation. With regard to her right knee, the claimant has sought minimal treatment. When she has sought treatment, she does exhibit some tenderness and crepitus. However, imaging has revealed only mild degenerative joint disease. The record is devoid of any evidence showing a significant degree of muscle atrophy, sensory or motor loss, reflex abnormality, gait disturbance, or significantly reduced range of motion. The claimant has never been referred by a physician to a pain management clinic notwithstanding her allegations of debilitating pain. Additionally, the claimant has not required aggressive medical treatment or surgical intervention to address her alleged knee pain. Moreover, no treating provider has placed long-term restrictions on the claimant's physical activities as a result of her knee pain nor have any providers indicated that the claimant could not or should not work as a result of her knee pain. Furthermore, the claimant's daily activities, discussed in detail below, have not been significant[ly] impacted by her allegedly disabling physical symptoms. Accordingly, the undersigned finds the claimant's right knee pain does not cause more than a minimal limitation in the claimant's ability to perform basic work activities and is therefore nonsevere.

17

Because the claimant has medically determinable mental impairments, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR. Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria. The first functional area is activities of daily living. The next functional area is social functioning. The third functional area is concentration, persistence or pace. The fourth functional area is episodes of decompensation.

The claimant has been diagnosed with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder, for which she has received some treatment and medications. However, the claimant's treatment has been limited. After her alleged onset date of disability, the claimant did not seek mental health treatment until September 2010, having previously responded well to mental health treatment. While receiving treatment in March 2009, the claimant reported doing well; she was also doing very well at her job; and she wanted to continue her medications which she was tolerating well without significant documented side effects. In September 2010, upon resuming treatment, she reported no recent hospitalization, no current treatment, and no current medications. She was restarted on medications at that time. In treatment, her mental status examinations generally show the claimant to be alert and oriented; her mood is euthymic; her eye contact is good; her speech and thought processes are logical; her psychomotor activity is normal; her attention and concentration are intact; her memory is intact; and her intelligence is estimated as average. Although she has been assigned a global assessment of functioning (GAF) score of 35 at the beginning of her treatment, the GAF is an unexplained "global" conclusion derived, apparently, from unexpressed impressions created by claimant's subjective complaints rather than from objective testing or reviewable measurements. Thus, the GAF scores give little assistance in arriving at specific functional limitations or capabilities. Moreover, at the times the claimant has been assigned with a GFA of 35, she has reported significant situational stressors such as losing her home, difficulties finding a job, and frustration over the behavior of her son. The claimant's treatment records only cover through October 2010, but at that time, the claimant was simply continued on her medications and . . . her appointments were becoming less frequent.

The claimant's activities have also not been significantly impacted by her conditions or symptoms experienced. The claimant has self-reported the ability to take care of her son; perform household chores; prepare meals; take care of pets; handle her own personal care; water plants; take out trash; drive; go out alone; . . . shop for food and clothes; manage finances; crochet; knit; sew; watch television; read; play computer games; pay attention indefinitely; complete tasks; and follow instructions. The claimant also has looked for work after her alleged onset date; has applied for unemployment benefits after her alleged onset date, indicating to the state that she is ready, willing, and able to work; and actually worked after her alleged onset date. While the claimant has not performed disqualifying substantial gainful activity per se, her attempts to work, obtain work, and obtain unemployment benefits does indicate that during the relevant period, the claimant may have been capable of a greater activity level than is being alleged herein.

Given the claimant's daily activities, her past response to mental health treatment and medications, her most recent appointment showing only a continuation of current

18

medications, and her most recent appointment indicating that she return to the clinic in four weeks rather than two, the undersigned finds the claimant's mental health conditions have not lasted nor are they expected to last 12 months.

(Tr. at 14-16).

## 1.    PRIOR WORK RECORD

The ALJ noted that plaintiff looked for work after her alleged onset date; has applied for unemployment benefits after her alleged onset date, indicating to the state that she is ready, willing, and able to work; and actually worked after her alleged onset date. Her earnings record shows a history of very low to no annual earnings -- she had no earnings at all during seven of the years prior to her alleged onset date, she had eight years of earning less than $1,000 during the year prior to her alleged onset date. Plaintiff reported that she stopped working on April 12, 2010, not because of any impairment, but because "I was having car trouble and was not able to get it fixed, so my employer let me go." Plaintiff's employment history does not support her credibility.

## 2.    DAILY ACTIVITIES

As the ALJ noted, plaintiff is able to take care of her son, perform household chores, prepare meals three times a day, take care of pets, handle her own personal care, water plants, take out trash, drive, go out alone, shop for food and clothes for several hours at a time, manage finances, crochet, knit, sew, watch television, read, play computer games, pay attention indefinitely, complete tasks, and follow instructions. Her daily activities do not support her credibility.

## 3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff's minimal medical records suggest that the duration, frequency and intensity of her symptoms are not as severe as she claims in her disability case. She testified that her knee pain is a 14 out of 10, yet during most of the time after her alleged onset date she was on no medication for her knee and the strongest pain medication she has ever been on is a non-

19

steroidal anti-inflammatory. She has only seen a doctor twice for her knee. She has only seen a doctor once for her back, it was prior to her alleged onset date and it was after she moved furniture. Plaintiff has never seen a doctor for any mental impairment since her alleged onset date. She has been treated by a nurse and the records reflect four visits over a two-month period with improvement of symptoms once she was put on medication. This factor does not support plaintiff's credibility.

4. *PRECIPITATING AND AGGRAVATING FACTORS*

The record is almost devoid of evidence of precipitating and aggravating factors. Plaintiff's back pain was caused by moving furniture. Her depression was exacerbated by her financial condition, her living situation, and her son's behavior, all of which is situational.

5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

As the ALJ noted, plaintiff's symptoms were controlled while on medication. Her nurse continued her on the same medications on her last visit and extended the time between visits because plaintiff was doing well. Plaintiff was never given anything stronger than a non-steroidal anti-inflammatory for her knee pain. This factor does not support plaintiff's testimony.

6. *FUNCTIONAL RESTRICTIONS*

Plaintiff was told by Karl Stammer, RN, to exercise caution around machinery and while ambulating when she was first put on Paxil and Trazodone, but by the next month she was told to exercise. There are no other functional restrictions in the record. This factor does not support plaintiff's credibility.

B. *CREDIBILITY CONCLUSION*

In addition to the above Polaski factors, I note that plaintiff included in her disability paperwork a history of being in the Army, but she told Karl Stammer, RN, that she had no military history. She also told Nurse Stammer that she had no criminal history, but the

20

following month she admitted that she had a bad check charge in her past. Plaintiff reported in her disability paperwork that she had worked 50 hours per week from January 1, 2009, through October 23, 2009, earning $11.25 per hour which would result in earnings of $25,368.75 for the year; however, plaintiff's earnings records show that she earned only $14,335.18 during 2009. Plaintiff testified that she cannot remember things or concentrate, yet in her disability paperwork she stated that she has no problem with memory or concentration. Plaintiff applied for (and "prayed for") unemployment benefits, indicating that she is available and capable of working, and she did indeed do part-time work after her alleged onset date, including working occasional eight-hour banquet shifts. This is inconsistent with her claim of disabling symptoms resulting in an inability to perform any job in the national or regional economy.

The substantial evidence in the record as a whole overwhelmingly supports the ALJ's finding that plaintiff's allegations of disabling symptoms are not credible.

## VII.    *SEVERE IMPAIRMENT*

Plaintiff argues that the ALJ erred in finding that her impairments were not severe.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)    Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

21

(2)     Capacities for seeing, hearing, and speaking;

(3)     Understanding, carrying out, and remembering simple instructions;

(4)     Use of judgment;

(5)     Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by her impairments.

Plaintiff argues that her mental impairment was severe, citing the medical records of Karl Stammer, RN.  Although the medical records of Nurse Stammer include diagnoses, they do not include any description of limitations, nor do they include any basis for the diagnoses other than plaintiff's own statements.

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006).  The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."  SSA separates information sources into two main groups: "acceptable medical sources" and "other sources."  It then divides "other sources" into two groups:  medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).  Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists.  20 C.F.R. § § 404.1513(a), 416.913(a) (2007).  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.     Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment.  Id.

2.     Only acceptable medical sources can provide medical opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

22

3. Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

SSR 06–3p is a clarification of existing SSA policies. The SSA explained its reasons for issuing the ruling:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

The ruling directs the SSA's adjudicators to give weight to opinions from medical sources who are not "acceptable medical sources":

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources,"

23

including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. . . .

[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

In general, according to the ruling, the factors for considering opinion evidence include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

Plaintiff was treated by Nurse Stammer from September 2, 2010, through October 27, 2010 -- a two-month period over which plaintiff saw him on four occasions. Mr. Stammer performed no tests, and his opinion was based solely on plaintiff's presentation and description of her symptoms. Plaintiff rated her depression a 9 out of 10. Considering that during her administrative hearing she rated her pain a 14 out of 10 and was never on anything stronger than a non-steroidal anti-inflammatory, her rating her depression a 9 out of 10 is somewhat questionable, especially when Nurse Stammer's findings are based on nothing more than plaintiff's subjective descriptions of her symptoms. A year earlier, plaintiff was seen at Freeman Hospital and was found to be alert and oriented times three with normal speech, normal mood, normal affect. In December 2009, she was alert and oriented times three with

normal mood and affect. In July 2010, Geoffrey Sutton, Ph.D., found no severe mental impairment. Dr. Sutton noted that plaintiff was doing very well with no complications in March 2009, and then canceled her follow up appointment and never rescheduled. By December 2009, her mental status exam was still normal, and no symptoms of mental impairment were noted when she was seen in the spring of 2010 for physical conditions. Plaintiff was observed to be "sad" on one occasion by Nurse Stammer, but was never observed by any doctor or other medical professional to be sad, teary-eyed, etc., on any other occasion. By the following month, Nurse Stammer observed that plaintiff had a euthymic mood.

There is nothing in Nurse Stammer's findings that are relevant to plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry, handle, see, hear, and speak. Nurse Stammer observed that plaintiff's memory and concentration were intact and her intelligence was average. Although he noted on one occasion that her judgment was limited, there is nothing in the record to explain how he came to that conclusion, and this was at a time when plaintiff was on no medication and had been receiving no mental health treatment for well over a year. Just a few weeks after being on anti-depressants, plaintiff was observed by Nurse Stammer to have good eye contact (which was an improvement from the previous visit), logical speech and thought processes, normal psychomotor activity (as opposed to being fidgety), and a euthymic mood.

The ALJ noted and relied on the great improvement in plaintiff's symptoms over a less-than-two-month period once she was put on anti-depressants. On plaintiff's last visit, the nurse kept plaintiff's medications the same and told her she did not need to come back for another month, whereas her previous visits were approximately every two weeks, indicating the nurse's belief that plaintiff's condition had improved. Having symptoms for two months is not sufficient

25

for Social Security disability benefits.  And being observed by a nurse on one occasion as appearing sad and having limited judgment is not sufficient to support a finding of a severe mental impairment.

Additionally, plaintiff failed to seek treatment for a mental impairment during all but two months of the period between her alleged onset date and the administrative hearing.  The absence of significant treatment suggests a claimant's mental impairments are not severe.  Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (rejecting severity of alleged mental impairments based on the fact that the claimant "had not required counseling, psychiatric treatment or hospitalization" and that she had long taken only small doses of an anti-anxiety drug).  The ALJ noted that plaintiff was taking no medications for a mental condition during most of the relevant time period; and a year prior to her alleged onset, she told her psychiatrist that her medications were working for her and she had no complaints and no side effects.  Her medications had permitted her to work in the past despite her mental condition and once she got back on anti-depressants, her condition improved once again.  Lack of strong medications is a valid factor in considering whether an impairment is severe.  Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009).  Furthermore, symptoms that can be controlled by treatment or medication are not disabling.  Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010); Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002).

Finally, in a Function Report dated June 2010 (shortly before she began seeing Nurse Stammer), plaintiff stated that she has no difficulty completing tasks, understanding, following instructions, getting along with others; and she has no problem with her memory or concentration.  She can pay attention indefinitely, she has no problems with changes in routine,

Case 3:11-cv-05110-REL   Document 16   Filed 10/23/12   Page 26 of 28

she is able to finish what she starts "without any trouble" and she has no problems following spoken or written instructions. This directly contradicts any argument that plaintiff suffers from a severe mental impairment.

Plaintiff points out the Nurse Stammer assigned her a GAF score of 35, suggesting serious symptoms. But as the ALJ explained, Nurse Stammer's GAF estimate in this case was not persuasive because it was unexplained. The ALJ noted that the GAF score had been "derived, apparently, from unexpressed impressions created by claimant's subjective complaints rather than from objective testing or reviewable measurements." Mr. Stammer's medical notes did not describe any symptoms or limitations other than plaintiff appearing sad and fidgety on one occasion, which certainly does not support a finding of a GAF of 35.

Plaintiff also claims that she has severe physical impairments, i.e., knee pain and back pain. She argues that her alleged knee pain was "corroborated" by right knee degenerative disease. However, plaintiff's having mild right knee degenerative joint disease corroborates only that she had a "medically determinable" impairment, not that she has resulting work-related limitations. As the ALJ pointed out, imaging revealed only mild degenerative joint disease, and the record does not contain any evidence that plaintiff had muscle atrophy, sensory or motor loss, reflex abnormality, gait disturbance, or significantly reduced range of motion. None of plaintiff's doctors told her to limit her activities as a result of knee pain. Additionally, plaintiff had only a small amount of treatment for her knee: she saw a doctor only two times, and she received only non-steroidal anti-inflammatories and an over-the-counter knee brace. Her last treatment for her knee was in June 2010, only about three months after her alleged onset date and more than six months before the ALJ issued her decision. Plaintiff was seen only one time for back pain -- this visit was prior to her alleged onset date and was the result of moving furniture. No further treatment was sought for her

back pain.

Finally, plaintiff argues that the ALJ failed to consider plaintiff's obesity which caused a "greater combined effect" on her limitations. Plaintiff's summary of the medical records mentions obesity one time -- claiming that Nurse Stammer, who treated plaintiff for depression and anxiety, diagnosed obesity on September 2, 2010. However, Nurse Stammer did not diagnose obesity. Nurse Stammer did not even weigh plaintiff. The cited medical record states that "Her observed weight is obese." No record contains any complaints of obesity-related limitations, nor do any of the records contain observed limitations or difficulties as a result of plaintiff's weight. Finally, plaintiff was able to work prior to her alleged onset date, and her weight was essentially the same as it was after her alleged onset date.

The substantial evidence in the record as a whole establishes that plaintiff sought very little medical care for her alleged disabling impairments; when she did seek treatment, the medical records describe no significant work-related restrictions; her treatment was extremely conservative; she was told by a medical practitioner to exercise; and when she took her medications as prescribed, her condition improved and she was stable. Therefore, I find that the ALJ did not err in finding that plaintiff's impairments are not severe.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 22, 2012

28